# UNITED STATES DISTRICT COURT

## District of Kansas

(Kansas City Docket)

UNITED STATES OF AMERICA,

**Plaintiff,**

**v.**

CYRIL GREGORY BUYANOVSKY,
    a.k.a. KIRILL BUYANOVSKY,

**and**

DOUGLAS EDWARD ROBERTSON,

**Defendants.**

CASE NO. 23-20010-DDC/TJJ
**Filed Under Seal**

---

# INDICTMENT

---

**THE GRAND JURY CHARGES**:

At all times material to this Indictment:

## BACKGROUND

1.    Since at least October 2020 to the present, CYRIL GREGORY BUYANOVSKY, a/k/a Kirill Buyanovsky, and DOUGLAS EDWARD ROBERTSON, the defendants, conspired to circumvent U.S. export laws and regulations in order to sell,

repair, and ship from the United States sophisticated avionics equipment to customers around the world that operate Russian-built aircraft.  Avionics are the electronics installed in aircraft and can include communications, navigation, flight control, and threat detection systems.

2.      In the course of exporting avionics equipment from the United States through their company, KanRus Trading Company Inc. ("KanRus"), which is located in the District of Kansas, BUYANOVSKY and ROBERTSON repeatedly concealed and misstated the true end users, value, and end destinations of their exports by creating false invoices; submitting false information on export documents; failing to file required export documents; transshipping items through third-party countries, such as Germany, the United Arab Emirates ("UAE"), Cyprus, and Armenia; exporting items to intermediary companies that then reexported the items to the ultimate end destinations; and receiving payments from foreign bank accounts located in the UAE, Cyprus, Russia, and Armenia.

3.      After the Russian Federation's unprovoked invasion of Ukraine on February 24, 2022, and the imposition of additional restrictions on the export of avionics from the United States to Russia, BUYANOVSKY and ROBERTSON continued to export avionics to Russia despite knowing that such exports required a license from the U.S. Department of Commerce, which they neither sought nor obtained.

<u>Individuals and Companies</u>

4.      The defendant CYRIL GREGORY BUYANOVSKY, also known as Kirill Buyanovsky, was a naturalized U.S. citizen who resided in Douglas County, Kansas.

BUYANOVSKY was the president and owner of KanRus. BUYANOVSKY previously worked at an avionics manufacturer as an engineer.

5.      The defendant DOUGLAS EDWARD ROBERTSON was a U.S. citizen who resided in Johnson County, Kansas. ROBERTSON was a commercial pilot and operated KanRus with BUYANOVSKY.

6.      KanRus was registered in the District of Kansas and supplied Western avionics equipment, including U.S.-origin equipment, and repair services for Russian-manufactured aircraft.

7.      "Russian Company-1" was located in Moscow, Russia and was a Russian aircraft parts distributor. "Individual-1," whose identity is known to the Grand Jury, was a Russian national and the chief executive officer of Russian Company-1.

8.      "Russian Company-2" was located in Krasnodar, Russia and provided aerial services using its fleet of helicopters. "Individual-2," whose identity is known to the Grand Jury, was an engineer working for Russian Company-2.

9.      "Russian Company-3" was located in Moscow, Russia and was a Russian aircraft maintenance, repair, and overhaul company. "Individual-3," whose identity is known to the Grand Jury, was an intermediary who negotiated and processed orders from Russian Company-3 for KanRus, BUYANOVSKY, and ROBERTSON.

10.     "Russian Company-4" was located in Moscow, Russia and was a Russian aircraft parts distributor. "Individual-3" was an intermediary who negotiated and processed orders from Russian Company-4 for KanRus, BUYANOVSKY, and ROBERTSON.

11.     "UAE Company-1" was located in Ajman, UAE and was a trading company that sent KanRus funds on behalf of Russian Company-3.

12.     "German Company-1" was located in Schöneck, Germany and was a logistics company that Russian Company-3 used to send and receive avionics equipment to and from KanRus in the United States.

13.     "Armenian Company-1" was located in Yerevan, Armenia and was a company that Russian Company-1 used to transship avionics equipment to Russia.

<u>The Statutory and Regulatory Background</u>

**The Export Control Reform Act and Export Administration Regulations**

14.     The Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Sections 730-774, were promulgated by the United States Department of Commerce, Bureau of Industry and Security ("BIS") to regulate the export of goods, technology, and software from the United States.  Under the Export Control Reform Act ("ECRA"), it was a crime to violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR, according to Title 50, United States Code, Section 4819(b).  Willful violations of the EAR constituted criminal offenses under the ECRA, as provided in Title 50, United States Code, Section 4819(b).

15.     Through the EAR, BIS reviewed and controlled the export of certain items from the United States to foreign countries in accord with Title 15, Code of Federal Regulations, Sections 734.2-3.  In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military

potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

16.     The most sensitive items subject to the EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.  Items listed on the CCL were categorized by an Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use, and end user of the item.

17.     On February 24, 2022, in response to the Russian Federation's unprovoked invasion of Ukraine, the U.S. Department of Commerce imposed new license requirements on exports and reexports to Russia.  As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL required a license to be exported to Russia.  *See* Volume 87, Federal Register, Page 12226 (published Mar. 3, 2022).

### The Commerce Control List Items

18.     A Traffic Alert and Collision Avoidance System ("TCAS"), or airborne collision avoidance system, is a family of airborne devices that function independently of the ground-based air traffic control system and provide collision avoidance protection for

a broad spectrum of aircraft types.  A TCAS is composed of many components, including a computer processor unit, transponders, control and display panels, and antennas.

19.     During the relevant period, certain components of a TCAS were on the CCL and classified by BIS under ECCN 7A994 (other navigation direction finding equipment, airborne communication equipment, all aircraft inertial navigation systems not controlled under 7A003 or 7A103, and other avionic equipment, including "parts" and "components").

20.     During the relevant time period, the following avionics were on the CCL and classified by BIS under ECCN 7A994 (navigation/communication systems): Honeywell BendixKing KI-203 installation kit, Honeywell BendixKing KT-74 transponder, and Honeywell BendixKing KA-61 L-Band antenna.  As of February 24, 2022, an export license was required from the Department of Commerce to export these avionics to Russia.

**Export and Shipping Records**

21.     Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States.  Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

22.     The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States.  Exporters or their authorized agents are required to file accurate and

truthful EEI for every export of goods from the United States with a value of $2,500 or more.  An EEI also is required regardless of the value of the goods if the goods require an export license.  Title 15, Code of Federal Regulations, Sections 758.1, 30.2

23.     A material part of the EEI and AES, as well as other export filings, is information concerning the end user and ultimate destination of the export.  The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

24.     As of June 29, 2020, all exports to Russia of items on the CCL, regardless of value, required an EEI filing.  Title 15, Code of Federal Regulations, Section 758.1(b)(10).

25.     The purpose of these requirements is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and end users because the EEI and AES aid in targeting, identifying, and when necessary, confiscating suspicious or illegal shipments before exportation.  Title 15, Code of Federal Regulations, Section 30.1(b).

## COUNT 1

### CONSPIRACY TO COMMIT OFFENSES AGAINST THE UNITED STATES
### [18 U.S.C. § 371]

26.     Paragraphs 1 to 25 of the introductory allegations are restated and realleged as if set forth herein.

27.     Between at least in or about 2020 and continuing to the present, the exact
dates being unknown to the Grand Jury, in the District of Kansas and elsewhere, the
defendants,

**CYRIL BUYANOVSKY, a.k.a. KIRILL BUYANOVSKY,**
**and**
**DOUGLAS EDWARD ROBERTSON,**

did knowingly and willfully combine, conspire, confederate, and agree with each other
and with others known and unknown to the Grand Jury, including individuals associated
with Russian Company-1, Russian Company-2, Russian Company-3, and Russian
Company-4, to commit offenses against the United States, that is:

a.     to willfully export and cause the exportation of goods from the
United States to Russia without first having obtained the required licenses from
the Department of Commerce in violation of Title 50, United States Code, Section
4819(a), and Title 15, Code of Federal Regulations, Section 764.2;

b.     to knowingly fail to file and submit false and misleading export
information through the EEI and the AES, and cause the same, in violation of Title
13, United States Code, Section 305, and Title 15, Code of Federal Regulations,
Section 30.71; and

c.     to fraudulently and knowingly export and send and attempt to export
and send from the United States merchandise, articles, and objects contrary to laws
and regulations of the United States, and receive, conceal, buy, sell, and facilitate
the transportation, concealment, and sale of such merchandise, articles, and
objects, prior to exportation, knowing the same to be intended for exportation

contrary to laws and regulations of the United States, in violation of Title 18,

United States Code, Section 554.

## Objects of the Conspiracy

28.    The objects of the conspiracy were:

a.    to acquire avionics equipment that was manufactured and sold in the United States on behalf of entities that operated Russian-built aircraft in Russia and other countries;

b.    to repair and recertify in the United States avionics equipment that was used in Russian-built aircraft located and operated outside of the United States;

c.    to export avionics equipment from the United States directly and indirectly, to Russia and Russian end users located in other countries;

d.    to conceal the prohibited activities and transactions from detection by the U.S. Government so as to avoid penalties and disruption of the illegal activities;

e.    to profit through these illegal activities; and

f.    to evade the prohibitions and licensing requirements of the ECRA and EAR.

## Manner and Means of the Conspiracy

29.     Defendants BUYANOVSKY and ROBERTSON and other co-conspirators known and unknown to the Grand Jury used the following manner and means, among others, to accomplish the objects of the conspiracy:

a.     BUYANOVSKY, ROBERTSON, and other co-conspirators, including individuals associated with Russian Company-1, Russian Company-2, Russian Company-3, and Russian Company-4, used email and other means to communicate;

b.     Individuals associated with Russian Company-1, Russian Company-2, Russian Company-3, and Russian Company-4 solicited quotes from and negotiated with BUYANOVSKY and ROBERTSON for the purchase and repair of U.S. avionics equipment for Russian customers and customers that operated Russian-built aircraft;

c.     BUYANOVSKY and ROBERTSON purchased items from companies in the United States to fulfill orders from Russian customers, including by providing false information to the U.S. companies;

d.     BUYANOVSKY and ROBERTSON used coded language in their email communications to conceal their illegal conduct;

e.     BUYANOVSKY, ROBERTSON, and other co-conspirators, including individuals associated with Russian Company-1, Russian Company-2, and Russian Company-3, arranged for shipment of the U.S. goods from the United

States to transshipment points in Germany, the UAE, Cyprus, and Armenia to
conceal the true end users and end destinations;

f.      BUYANOVSKY and ROBERTSON falsified export and shipping
records regarding shipments from the United States, including by providing false
and misleading information to the shippers and freight forwarders, to conceal the
true value of the goods, the ultimate destination of the goods, and the ultimate end
user of the goods;

g.      Individuals associated with Russian Company-1, Russian Company-
2, and Russian Company-3 transferred funds for the purchase and shipment of the
goods through bank accounts in the UAE, Russia, Cyprus, and Armenia to
KanRus's bank account in the United States; and

h.      BUYANOVSKY, ROBERTSON, and other co-conspirators,
including individuals associated with Russian Company-1, caused the U.S. goods
to be exported from the United States to individuals and entities in Russia without
obtaining the required licenses from the Department of Commerce.

**Overt Acts in Furtherance of the Conspiracy**

30.     In furtherance of the conspiracy and to achieve the objects thereof,
Defendant BUYANOVSKY, Defendant ROBERTSON, and others committed and
caused to be committed the following overt acts, among others, in the District of Kansas
and elsewhere:

*February 4, 2021 Export to Russian Company-2 in South Sudan*

31.     On or about October 14, 2020, Individual-2, an engineer at the helicopter company Russian Company-2, sought a quote to repair a computer component of a TCAS that was located in South Sudan.  After BUYANOVSKY advised that the component could not be imported from or exported to South Sudan, BUYANOVSKY and Individual-2 agreed to ship the component from and return it to the UAE.

32.     On or about November 11, 2020, Individual-2 emailed a draft invoice to BUYANOVSKY, which BUYANOVSKY then forwarded to ROBERTSON and asked him to look at before the component was shipped.  The invoice listed the customer as a UAE company, did not mention Russian Company-2 or South Sudan, and falsely listed the value of the component as $100.

33.     On or about November 11, 2020, BUYANOVSKY emailed the aforementioned invoice back to Individual-2, along with a separate stamped invoice that listed the true value of the transaction as $10,950.  Individual-2 responded and asked whether the value of the component could be undervalued on the shipping invoice (*i.e.*, the invoice that would accompany the component when it was shipped) to lower the customs fees at the destination.  BUYANOVSKY agreed to lower the value on the shipping invoice.

34.     On or about November 25, 2020, Russian Company-2 made a payment from a Cypriot bank account to KanRus's bank account for this export.

35.     On or about December 5, 2020, Russian Company-2 shipped the TCAS computer component from the UAE to KanRus in the District of Kansas.  The reported U.S. customs value on the shipment was $100.

36.     Upon receipt of the TCAS computer component, BUYANOVSKY emailed a U.S. company to request pricing for the repair.  During those communications, the U.S. company requested that BUYANOVSKY complete an end-use and end-user statement. BUYANOVSKY forwarded the request to Individual-2, who completed and returned the statement.  BUYANOVSKY then forwarded the end-use and end-user statement to the U.S. company.  The statement claimed, among other things, that Russian Company-2 was the end user and that the component would be delivered to Russia.  The statement failed to mention South Sudan.

37.     On or about February 4, 2021, BUYANOVSKY and ROBERTSON exported the repaired TCAS computer component to the address of another UAE company that Individual-2 had provided to BUYANOVSKY.

38.     On or about February 4, 2021, BUYANOVSKY caused the shipper to fail to file an EEI in connection with this export.

*February 26, 2021 Export to Russian Company-3 in Russia*

39.     On or about November 11, 2020, Individual-3 from Russian Company-3 emailed ROBERTSON a list of avionics equipment for KanRus to repair in the United States, along with a shipping label that showed the equipment being shipped from German Company-1 to KanRus.  Individual-3 also sent ROBERTSON a proforma

customs invoice that valued the equipment at $380 and listed the shipper as a UAE company that had the same name as Russian Company-3.

40.     On or about November 20, 2020, ROBERTSON emailed Individual-3 and described the specific pieces of avionics equipment that he had received from Individual-3.  One of the pieces of equipment was a TCAS computer processor called a TPU. Regarding the TPU, ROBERTSON wrote, "TPU has a ФСБ [*i.e.*, FSB] sticker on it!!!" In response, Individual-3 wrote, "Interesting about sticker, you can remove and after stick on back?"  FSB is the acronym for the Federal Security Service of the Russian Federation, which is the principal intelligence and security agency of the Russian government.

41.     On or about January 27, 2021, ROBERTSON emailed Individual-3 an invoice for the repairs with a total value of $28,769.  The invoice listed German Company-1 as the recipient company and UAE Company-1 as the payor company.

42.     On or about February 9, 2021, UAE Company-1 made a payment to KanRus's U.S. bank account for this export.

43.     The next day, on or about February 10, 2021, Individual-3 emailed ROBERTSON a proposed "shipping" invoice that undervalued the repaired goods at $3,645.

44.     On or about February 25, 2021, ROBERTSON asked Individual-3, "can I change value to less than $2500? Less paperwork for me."

45.     On or about February 26, 2021, ROBERTSON exported some of the repaired avionics equipment to German Company-1, specifically the TPU processor and a radar sensor.

46.     On or about February 26, 2021, ROBERTSON sent Individual-3 a copy of the shipping label and invoice that undervalued the equipment at $2,275.

47.     On or about February 26, 2021, ROBERTSON caused the shipper to fail to file an EEI in connection with this export.

*April 1, 2021 Export of Large Avionics Shipment to Russian Company-3*

48.     On or about January 20, 2021, Individual-3 emailed ROBERTSON to ask for a quote for an order of multiple avionics components, including a TPU processor, antennas, and transponders.  ROBERTSON provided a quote and asked, "When is [Russian Company-3] wanting to pay?"

49.     On or about January 27, 2021, ROBERTSON emailed Individual-3 a stamped invoice for the shipment valuing the goods at $159,625.  As with the February 26, 2021 export, UAE Company-1 was listed as the payor company and German Company-1 was listed as the recipient company.

50.     On or about February 8, 2021, UAE Company-1 sent $159,625 to KanRus's U.S. bank account.  Later that day, BUYANOVSKY emailed ROBERTSON and told him that the order was "fully funded to the tune of 159625 this morning."

51.     After on or about February 8, 2021, ROBERTSON and BUYANOVSKY proceeded to purchase the avionics equipment from U.S. companies.

52.     On or about March 29, 2021, ROBERTSON emailed a freight forwarder an invoice for this shipment that listed the value of the goods as $6,118 and the recipient as Germany Company-1.  ROBERTSON also attached a Shipper's Letter of Instructions that identified German Company-1 as the ultimate consignee and incorrectly listed the ECCN for the components as EAR99.

53.     On or about April 1, 2021, ROBERTSON caused the avionics equipment to be exported.

54.     On or about April 1, 2021, ROBERTSON caused the shipper to file a false and misleading EEI that listed the value of the export as $6,118 and the ultimate consignee as Germany Company-1 when, in fact, the avionics shipment was valued at $159,625 and was destined for Russian Company-3.

*February 28, 2022 Attempted Export to Russian Company-1 and Detention*

55.     On or about February 7, 2022, Individual-1 placed an order with BUYANOVSKY to order Honeywell BendixKing KT-74 transponders from a U.S. company and ship them to Russia.  Individual-1 also told BUYANOVSKY that after BUYANOVKSY received the transponders from the U.S. supplier and received payment from Individual-1, the transponders needed to be sent to Individual-1 in Russia.

56.     On or about February 10, 2022, Russian Company-1 made a payment from a Russian bank account to KanRus's bank account for four KT-74 transponders.

57.     On or about February 18, 2022, Russian Company-1 made a payment from a Russian bank account to KanRus's bank account for four more KT-74 transponders.

58.     On or about February 28, 2022, ROBERTSON attempted to export the eight KT-74 transponders to Russian Company-1 in Russia, but the shipment was detained by the U.S. Government, after which BIS directly informed ROBERTSON that a license was required to export the KT-74 transponders to Russia.

*April 29, 2022 Export to Laos for Russian Company-4*

59.     On or about January 27, 2022, Individual-3 sent ROBERTSON an invoice to purchase two Honeywell BendixKing KT-74 transponders, two Honeywell BendixKing KN-53 navigation receivers, and two Honeywell BendixKing KN-53 installation kits and export them to Russian Company-4 in Russia for $27,806.

60.     On or about January 31, 2022, Russian Company-4 made a payment from its Russian bank account to KanRus's U.S. bank account for this export.

61.     On or about March 8, 2022, after Russia's invasion of Ukraine, the U.S. Government's imposition of additional restrictions on exports and reexports to Russia, and the U.S. Government's detention of KanRus's attempted export to Russian Company-1, ROBERTSON emailed BUYANOVSKY.  ROBERTSON attached a proposed letter to send to Individual-3, which described the current options for shipping as either shipping within the U.S. or shipping to a company in a neutral country that was not a logistics company and did not have ties to Russia.

62.     On or about March 8, 2022, ROBERTSON emailed the "shipping options" letter to Individual-3.

63.     After on or about March 8, 2022, ROBERTSON and Individual-3 exchanged emails discussing possible shipping options, including whether specific companies in the UAE or Laos would be acceptable recipients.

64.     On or about March 30, 2022, Individual-3 sent ROBERTSON an email that stated that Russian Company-4 wanted to ship the avionics equipment directly to Laos.

65.     On or about April 27, 2022, ROBERTSON exchanged emails with Individual-3 in which he stated, among other things, that "things are complicated in USA," and that the invoice amount needed to be less than $50,000 because, otherwise, there would be "more paperwork and visibility" and "This is NOT the right time for either."

66.      On or about April 29, 2022, ROBERTSON caused the avionics equipment to be exported to Laos.

*May 20, 2022 Export to Russian Company-1 via Cyprus*

67.     On or about April 26, 2022, Individual-1, who was the chief executive officer of Russia Company-1, booked a flight from Russia to Cyprus scheduled to depart on or about May 14, 2022.

68.     On or about May 16, 2022, BUYANOVSKY ordered seven Honeywell BendixKing KI-203 installation kits for Individual-1.  These kits were on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

69.     On or about May 20, 2022, Individual-1 made a payment from a Cypriot bank account to KanRus's bank account for this export.

70.     On or about May 20, 2022, ROBERTSON caused the seven installation kits to be exported to Individual-1 at a residential address in Cyprus.

71.     On or about May 20, 2022, ROBERTSON caused the shipper to fail to file an EEI in connection with this export.

72.     On or about May 20, 2022, BUYANOVSKY emailed the invoice and shipping label for this export to Individual-1.

73.      On or about May 26, 2022, Individual-1 received the package of seven KI-203 installation kits in Cyprus.

74.     On or about May 28, 2022, Individual-1 flew back to Russia from Cyprus.

75.     At no time did either ROBERTSON or BUYANOVSKY obtain the required license from the Commerce Department to export or reexport the KI-203 installation kits to Russia.

*June 16, 2022 Export to Russian Company-1 via Armenia*

76.     On or about June 9, 2022, Armenian Company-1 emailed BUYANOVSKY and asked for an offer for eight KT-74 transponders to be exported to Yerevan, Armenia. The eight transponders were the same make and model of the eight transponders that ROBERTSON and BUYANOVSKY had attempted to export to Individual-1 of Russian Company-1 in February 2022 as described in paragraphs 55 to 58.  BUYANOVSKY then forwarded the proposed invoice for the shipment to ROBERTSON and wrote that, "The V [*i.e.*, the first initial of Individual-1's last name] connection requested an invoice and for some reason they wanted the transportation cost to Yerevan. . . . Is export department ok with this?"

77.     On or about June 16, 2022, ROBERTSON caused the eight KT-74 transponders to be exported to Armenian Company-1.  The KT-74 transponders were on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

78.     On or about June 16, 2022, ROBERTSON caused the shipper to fail to file an EEI for this export.

79.     On or about June 28, 2022, Armenian Company-1 reexported the KT-74 transponders from Armenia to Russia.

80.     At no time did either ROBERTSON or BUYANOVSKY obtain the required license from the Commerce Department to export or reexport the KT-74 transponders to Russia.

*July 18, 2022 Export to Russian Company-1 via Armenia*

81.     On or about July 11, 2022, ROBERTSON and BUYANOVSKY emailed each other about another export to Armenian Company-1.  The subject line of the email exchange was, "V" – the first initial of Individual-1's last name.  BUYANOVSKY told ROBERTSON that a "somewhat more proper sequence of events can now proceed" and that "V will pay once they get the invoice."

82.     Also on or about July 11, 2022, Armenian Company-1 made a payment from an Armenian bank account to KanRus's bank account for eight Honeywell BendixKing KA-61 L-Band antennas.

83.     On or about July 18, 2022, ROBERTSON emailed the shipping documents for this export to BUYANOVSKY and caused the export of the eight KA-61 antennas to

Armenian Company-1. The KA-61 antennas were on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

84. On or about July 18, 2022, ROBERTSON caused the shipper to fail to file an EEI for this export.

85. On or about July 27, 2022, the Armenian company reexported the eight KA-61 antennas to Russia.

86. At no time did either ROBERTSON or BUYANOVSKY obtain the required license from the Commerce Department to export or reexport the KA-61 antennas to Russia.

87. All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-4

### UNLAWFUL EXPORT OF U.S.-ORIGIN CONTROLLED GOODS TO RUSSIA
[50 U.S.C. § 4819]

88. The factual allegations in paragraphs 1 to 87 are hereby realleged and incorporated as if set forth in this paragraph.

89. On or about the dates listed for each count, in the District of Kansas and elsewhere, the defendants,

**CYRIL BUYANOVKSY, a.k.a. KIRILL BUYANOVSKY,**
**and**
**DOUGLAS EDWARD ROBERTSON,**

knowingly and willfully exported and attempted to export and caused to be exported from the United States to Russia the items identified for each count, without first having obtained the required authorization and license from the Commerce Department:

| Count | Approximate Date of Export | Exported Items |
|-------|----------------------------|----------------|
| 2 | May 20, 2022 | Seven (7) KI-203 installation kits |
| 3 | June 16, 2022 | Eight (8) KT-74 transponders |
| 4 | July 18, 2022 | Eight (8) KA-61 antennas |

in violation of Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Section 764.2; and Title 18, United States Code, Section 2.

## COUNTS 5-7

### SUBMITTING FALSE OR MISLEADING EXPORT INFORMATION
### [13 U.S.C. § 305]

90.     The factual allegations in paragraphs 1 to 87 are hereby realleged and incorporated as if set forth in this paragraph.

91.     On or about the dates listed for each count, in the District of Kansas and elsewhere, the defendants,

**CYRIL BUYANOVKSY, a.k.a. KIRILL BUYANOVSKY,**
**and**
**DOUGLAS EDWARD ROBERTSON,**

knowingly and willfully failed to file and submitted false and misleading information through the Electronic Export Information and the Automated Export System, and caused the same, in connection with the exported items identified in each count:

| Count | Approximate Date of Export | Exported Items |
|-------|---------------------------|----------------|
| 5 | February 4, 2021 | TRC-899 TCAS computer component |
| 6 | February 26, 2021 | TPU-67A TCAS computer processor; ART-2100 radar sensor |
| 7 | April 1, 2021 | TPU-67B TCAS computer processor; MST-67A transponder; two (2) IVA-81D TCAS speed indicators; PS-578 transponder; ANT-67A antenna |

in violation of Title 13, United States Code, Section 305; Title 15, Code of Federal Regulations, Section 30.71; and Title 18, United States Code, Section 2.

## COUNTS 8-13

### SMUGGLING GOODS FROM THE UNITED STATES
### [18 U.S.C. § 554]

92.     The factual allegations in paragraphs 1 to 87 are hereby realleged and incorporated as if set forth in this paragraph.

93.     On or about the dates listed for each count, in the District of Kansas and elsewhere, the defendants,

**CYRIL BUYANOVKSY, a.k.a. KIRILL BUYANOVSKY,**
**and**
**DOUGLAS EDWARD ROBERTSON,**

fraudulently and knowingly exported and sent and attempted to export and send from the United States the merchandise, articles, and objects identified in each count, contrary to the laws and regulations of the United States, to wit, Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Section 764.2; Title 13, United States Code, Section 305; and Title 15, Code of Federal Regulations, Section 30.71, and

fraudulently and knowingly received, concealed, bought, sold, and facilitated the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for export contrary to such laws and regulations of the United States:

| Count | Approximate Date of Export | Exported Items |
|-------|---------------------------|----------------|
| 8 | February 4, 2021 | TRC-899 TCAS computer component |
| 9 | February 26, 2021 | TPU-67A TCAS computer processor; ART-2100 radar sensor |
| 10 | April 1, 2021 | TPU-67B TCAS computer processor; MST-67A transponder; two (2) IVA-81D TCAS speed indicators; PS-578 transponder; ANT-67A antenna |
| 11 | May 20, 2022 | Seven (7) KI-203 installation kits |
| 12 | June 16, 2022 | Eight (8) KT-74 transponders |
| 13 | July 18, 2022 | Eight (8) KA-61 antennas |

in violation of Title 18, United States Code, Sections 554 and 2.

## FORFEITURE NOTICE

94.     The allegations contained in paragraphs 1 to 93 and Counts 1-13 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 50, United States Code, Section 4819, Title 13, United States Code, Section 305, Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

95.     Upon conviction of one or more of the offenses set forth in Counts 1-4 of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 50,

United States Code, Section 4819, any property: used or intended to be used in any manner to commit or facilitate the offenses; constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the violations; or constituting an item or technology that is exported or intended to be exported in violation of the offenses.  The property to be forfeited includes, but is not limited to, the following:

A.  A forfeiture money judgment against each defendant in an amount equal to the amount of gross proceeds obtained or derived by that defendant from the commission of Counts 1-4.

96.    Upon conviction of one or more of the offenses set forth in Counts 5-7 of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 13, United States Code, Section 305, any interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the offenses; any interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the offenses; and any property constituting, or derived from, any proceeds obtained directly or indirectly as a result of the offenses.

97.    Upon conviction of one or more of the offenses set forth in Counts 8-13 of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, the following:

A.  A forfeiture money judgment against each defendant in an amount equal to the amount of gross proceeds obtained or derived by that defendant from the commission of Counts 8-13.

98.    If any of the property described above, as a result of any act or omission of the defendants:

A.    cannot be located upon the exercise of due diligence;

B.    has been transferred or sold to, or deposited with, a third party;

C.    has been placed beyond the jurisdiction of the court;

D.    has been substantially diminished in value; or

E.    has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant

to Title 21, United States Code, Section 853(p).

A TRUE BILL.


March 1, 2023                                  s/Foreperson
DATE                                FOREPERSON OF THE GRAND JURY


DUSTON J. SLINKARD
UNITED STATES ATTORNEY

By: /s/ Ryan Huschka
RYAN HUSCHKA
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360

Kansas City, Kansas 66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: ryan.huschka@usdoj.gov
Ks. S. Ct. No. 23840

By: /s/ Scott C. Rask
SCOTT C. RASK
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas 66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: scott.rask@usdoj.gov
Ks. S. Ct. No. 15643

By: /s/ Adam P. Barry
ADAM P. BARRY
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Ph: (202) 233-0788
Fax: (202) 532-4251
Email: adam.barry@usdoj.gov
Cal. Bar No. 294449

IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

## **PENALTIES**

## **Count 1, Conspiracy**

- Punishable by a term of imprisonment of not more than five.  18 U.S.C. § 371.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## **Counts 2-4, Export Goods to Russia**

- Punishable by a term of imprisonment of not more than twenty years.  50 U.S.C. § 4819.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $1,000,000.  50 U.S.C. § 4819.

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## **Counts 5-7, False Export Information**

- Punishable by a term of imprisonment of not more than five years.  13 U.S.C. § 305 and 15 C.F.R. § 30.71(a).

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $10,000 per violation.  13 U.S.C. § 305(a), (f); 18 U.S.C. § 3571(e).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## Counts 8-13, Smuggling

- Punishable by a term of imprisonment of not more than ten years.  18 U.S.C. § 554.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.