# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

Plaintiff,

v. CASE NO. 23-20010-01-DDC

CYRIL GREGORY BUYANOVSKY
a.k.a. KIRILL BUYANOVSKY,

Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

APPEAR NOW the United States of America, by and through undersigned counsel, and respectfully submits the following in support of the government's recommendation for Cyril Buyanovsky's sentence in this case.

In accord with the plea agreement and as supported below, the government recommends a sentence of 24 months' imprisonment.

### I. PROCEDURAL HISTORY

On March 1, 2023, the grand jury returned a 13-count Indictment charging Mr. Buyanovsky and Douglas Robertson for their scheme to smuggle and export

goods to Russia, circumventing the regulations of the U.S. Department of Commerce. (Doc. 1, Indictment.)

In conjunction with the service of search warrants on March 2, 2023, at their respective residences and business location, agents arrested both Mr. Buyanovsky and Mr. Robertson in this case. On March 3, 2023, the Magistrate Judge conducted Mr. Buyanovksy's initial appearance, and he was released on conditions. (Doc. 5, Minutes; Doc. 7, Order.)

On October 11, 2023, the grand jury returned a Superseding Indictment that added counts similar to what was initially charged plus international money laundering violations. (Doc. 51, Super. Indictment.)

On December 20, 2023, Mr. Buyanovsky pled guilty pursuant to a plea agreement to Counts 1 (Section 371 multi-prong conspiracy to export goods to Russia without first obtaining the required licenses, to fail to file or submit false or misleading export information to the U.S. Department of Commerce, and to smuggle goods outside the United States) and 23 (international money laundering conspiracy). (Doc. 62, Minutes; Doc. 64, Plea Agreement.)

On March 27, 2024, the grand jury returned a Second Superseding Indictment in this case that added Mr. Chistyakov, charging he and Mr. Robertson with a multi-prong export conspiracy, export violations, smuggling,

money laundering conspiracy, and international money laundering offenses. (Doc. 75, 2d Super. Indictment.)

On July 2, 2024, Mr. Robertson pled guilty to Counts 1 (Section 371 multi-prong conspiracy to export goods to Russia without first obtaining the required licenses, to fail to file or submit false or misleading export information to the U.S. Department of Commerce, and to smuggle goods outside the United States), 5 (export to Russia), 6 (export to Russia), and 23 (international money laundering conspiracy) of the Second Superseding Indictment pursuant to a plea agreement. (Doc. 81, Minutes; Doc. 84, Plea Agreement.)

On September 30, 2025, Mr. Chistyakov pled guilty to Count 1 (Section 371 multi-prong conspiracy to export goods to Russia without first obtaining the required licenses, to fail to file or submit false or misleading export information to the U.S. Department of Commerce, and to smuggle goods outside the United States) of the Second Superseding Indictment pursuant to a plea agreement. (Doc. 141, Minutes; Doc. 143, Plea Agreement.)

The U.S. Probation Office conducted an investigation and submitted a Presentence Report. (Doc. 145, PSR.) The PSR determined the base offense level to be 26. (*Id.* at ¶ 73.) The PSR added a two-level specific offense characteristic for the Section 1956 money laundering conviction (*id.* at ¶ 74) and

a two-level adjustment for role in the offense (*id.* at ¶ 76). With a three-level reduction for acceptance of responsibility, the total offense level is 27. (*Id.* at ¶¶ 80-82.) With no criminal history, the applicable guidelines range is 70-87 months' imprisonment. (*Id.* at ¶ 106.)

Mr. Buyanovsky made twelve objections to the PSR. (*Id.* at ¶¶ 146-85.) Only two of those objections relate to the guidelines calculation – role in the offense enhancement (*id.* at ¶¶ 168-71) and lack of a zero-point offender reduction (*id.* at ¶¶ 172-76).

On March 20, 2026, the Court sentenced Mr. Chistyakov to 28 months' imprisonment. (Doc. 156, Minutes; Doc. 158, Judgment.)

On April 24, 2026, Mr. Buyanovsky submitted his Sentencing Memorandum requesting "a sentence of probation (with a period of home detention if the Court finds it appropriate)." (Def. Sent. Memo. at 2.) He suggests that a variance is necessary under the statutory factors of 18 U.S.C. § 3553(a) because of an unwarranted disparity, his history and characteristics, and no need for deterrence.

## II. <u>FACTUAL BACKGROUND</u>

### A. *The Export Control Reform Act and Export Administration Regulations*

On August 13, 2018, the President signed into law the National Defense

Authorization Act of 2019, which included ECRA. *See* 50 U.S.C. § 4801 *et seq*. ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

Through the EAR and ECRA, the U.S. Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") reviews and controls export from the United States to foreign countries of certain items. In particular, BIS places restrictions on the export and reexport of items that it determines could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

On February 24, 2022, in response to Russia's invasion of Ukraine, BIS imposed new license requirements on exports and re-exports to Russia. On March 3, 2022, BIS imposed additional license requirements for exports, reexports, and transfers to or within Russia of any items subject to the EAR that are identified under certain Schedule B or Harmonized Tariff Schedule ("HTS") codes. *See* 87 Fed. Reg. 12856 (March 8, 2022); 15 C.F.R. Part 746, Supp. No. 4. HTS codes take their first six digits from the corresponding Harmonized

System ("HS") code, which are a standardized numerical method of classifying traded products used by customs authorities around the world.

Since March 2022, BIS has gradually restricted additional items from export or reexport to Russia. *See* 15 C.F.R. § 746.8. The additional export controls target Russia's military-industrial base and include items related to the Russian oil and gas refinery and production, aviation, and aerospace industries; commercial and industrial operations; electronics and navigational equipment; industrial machinery, lubricants, and metals; software; and chemical and biological precursors. These restrictions further limit Russia's access to items of potential military significance and expand the economic impact of controls that deny Russia additional resources it needs to continue waging war.

Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR. *See* 50 U.S.C. § 4819(a)(1). ECRA prohibits, *inter alia*, ordering, buying, selling, and transporting items to be exported from the United States with knowledge that such conduct is a violation of ECRA, *see id.* § 4819(a)(2)(E); making any false or misleading representation and/or falsifying or concealing any material fact to an official of the United States in the course of any action subject to the EAR, *see id.* §

4819(a)(2)(F); engaging in any transaction or taking any other action with "intent to evade the provisions of this title, the Export Administration Regulations, or any order, license, or authorization issued thereunder," *see id.* § 4819(a)(2)(G); and failing or refusing to comply with associated reporting or recordkeeping requirements, *see id.* § 4819(a)(2)(H).

Additionally, an exporter of goods from the United States is required to file information with the U.S. government about the intended exports under certain circumstances. Specifically, an exporter is required to file Electronic Export Information ("EEI") through the Automated Export System ("AES") when, among other reasons, an export license was required, or the value of the commodity being exported was more than $2,500. 15 C.F.R. § 758.1. The EEI requires an exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address, and a description of the commodity to be exported. The purpose of these requirements is to strengthen the U.S. government's ability to prevent the export of certain items to unauthorized destinations and end users.

Failure to file EEI or providing false or misleading information in EEI is a violation of ECRA, *see, e.g.*, 50 U.S.C. 4819(a)(2)(F); the EAR, *see* 15 C.F.R. Part 758; 13 U.S.C. § 305; and the Foreign Trade Regulations, *see* 15 C.F.R. Par

30.

B. *Historical Setting*[1]

A secret protocol of the German-Soviet Nonaggression Pact from August 23, 1939, separated eastern Europe under either the influence of Germany or under the influence of the Soviet Union. Latvia was included in the part of eastern Europe subjected to Soviet Union influence. Slightly more than one week after entering this Pact, Adolf Hitler ordered the invasion of Poland to begin on September 1, 1939, which led to the declarations of war by Great Britain and France on September 3, 1939. (While Germany invaded Poland from the west, the Soviet Union began its invasion of Poland from the east beginning on September 17, 1939. Before the end of September, Germany and the Soviet Union adjusted their previously agreed upon division of Poland resulting in more territory controlled by Germany.)

In October 1939, Latvia acceded to Soviet Union pressure, so the U.S.S.R. took control of various military bases in Latvia. By June 1940, Soviet troops invaded and occupied Latvia, deported the Latvian President, and installed new "elected" leaders. By August 5, 1940, the Soviet Union incorporated Lativa into the U.S.S.R. In the first year of Soviet occupation, tens of thousands of

[1] *See generally*, The Museum of the Occupation of Latvia, https://okupacijasmuzejs.lv/en/history (last accessed March 12, 2026).

Latvians were deported to eastern portions of the U.S.S.R., including prison camps in Siberia.

During part of the German invasion of the Soviet Union from mid-1941, Germany occupied Latvia, conscripting Latvians into the German army and executing more than 50,000 Latvian Jews. By 1944, the Soviet Union regained control of most of Latvia with an estimated 100,000 Latvians fleeing to other countries.

Following World War II, more than 125,000 Latvians were part of the Soviet Union's mass deportations to northern Russia and Siberia. In the 1950s, the ruling communist party in Latvia was dominated by those not originally from Latvia, which continued until the 1980s. Following the 1990 election, the Latvian legislature passed a declaration to renew independence.[2] Initially, the Soviet Union resisted the Latvian independence effort, which led to violent responses in 1991. However, by September 1991, the Soviet Union recognized Latvian independence. Yet, tensions remained between Latvia and the Soviet Union from the decades of "occupation" and the eventual prosecution of some Soviets for war crimes from World War II.

This is summarized on a sign explaining the "Museum of the Occupation

---

[2] The Berlin Wall "fell" on November 9, 1989.

of Latvia" in Riga.




C. *Geographical Setting*

Latvia is situated on the Baltic Sea and part of what is generally referred to as one of the "Baltic States." As depicted in this map below, Latvia is between Estonia and Lithuania on the Baltic Sea across from Sweden and Finland. Latvia's eastern border is approximately 100 miles with Russia, and its southeastern border is approximately 75 miles with Belarus.




D. *Case Context*

On February 24, 2022, the Russian Federation ("Russia") invaded Ukraine. That invasion caused the United States to impose additional restrictions on the export of avionics from the United States to Russia, directly impacting KanRus's business activity. As seen on the map above and considering the historical background of Latvia and Russia, invasions by Russia of its neighbors is a major concern of Latvians. Thus, the participation of Latvian codefendant Oleg Chistyakov garnered significant attention by Latvian law enforcement.

On March 4, 2022, Latvia's capital city of Riga renamed the street where

Russia's embassy sits to Ukrainas Neatkarības iela in Latvian, "Ukrainian Independence Street," as depicted in the image below. *See* https://www.reuters.com/world/latvian-capital-rename-russian-embassy-address-independent-ukraine-street-2022-03-04/ (last accessed March 12, 2026).




Following Mr. Chistyakov's arrest in March 2024, he had an appearance in Latvian court on the Provisional Arrest Warrant based on the Complaint filed in this case. The prosecuting authority in Latvia had the Complaint from this case as part of that proceeding in Latvia. One of the prosecutors spoke with members of the prosecution team as part of that preparation in Latvia. During that conversation, the prosecutor described Mr. Chistyakov's offenses as "war crimes," which they presented as part of their basis for Mr. Chistyakov to remain in custody pending extradition to the United States.

Because the KanRus-shipped avionics supported Russian aircraft, because Russia invaded Ukraine, because Russia is a neighbor to Latvia, and because Latvia was concerned Russia could turn its sights on them, a genuine fear existed and caused their view of this conspiracy as directly connected to the Russian government and its war endeavors.

As such, the gravity of these offenses may differ depending upon the history, the geography, and the overall context. For the Latvians, they considered the export violations that benefited Russia as having "a highly negative impact on national and global security" because it allowed "Russia's military-industrial complex [to] gain[ ] critical and strategical advantages by bypassing sanctions on aviation parts through illicit procurement networks." The criminal acts of Mr. Buyanovsky and his conspirators "supported Russian military resources," "promote[d] Russian military and technological capacity and the development of defence and security sectors."

## III. ARGUMENT

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*,

552 U.S. 38, 49 (2007) (citation omitted). The Guidelines are not the only consideration. *See United States v. Booker*, 43 U.S. 220 (2005). The sentencing court must now engage only in a two-part analysis to determine the appropriate sentence.[3] First, the court must consider the Guideline range. A sentence within the guideline range is presumed reasonable. *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). Second, the court evaluates any deviation from the guidelines range based on the sentencing factors in 18 U.S.C. § 3553(a) and the court's responsibility to impose a sentence that is "sufficient" but "not greater than necessary" to meet the sentencing objectives in that provision. *United States v. Kaspereit*, 994 F.3d 2062, 1214 (10th Cir. 2021); *see also* U.S.S.G. § 1B1.1(b); *Rita v. United States*, 551 U.S. 338, 351 (2007).

18 U.S.C. § 3553(a) provides seven statutory factors for the court to consider so it may impose a sentence that is sufficient, but not greater than necessary to meet the objectives set forth in 18 U.S.C. 3553(a)(2). The sentencing court can and should engage in a holistic inquiry of these factors. *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014).

On appellate review, the court applies a two-step process. First, the court confirms the district court correctly calculated the Guideline range. Second,

[3] The Sentencing Commission removed the previous second step of this process when it eliminated the consideration of departure factors from Chapter 5.

the court examines under an abuse of discretion standard, the substantive reasonableness of the sentence, considering the totality of the circumstances including the extent of any variance from the Guidelines. *Gall v. United States,* 552 U.S. 38, 51, 169 L.Ed.2d 445 (2007).

A. *Guideline Calculations*

As noted above, the PSR applied the facts and correctly calculated the guidelines range of 70-87 months' imprisonment. The guidelines calculation included a two-level enhancement for role in the offense under U.S.S.G. § 3B1.1(c). (Doc. 145, PSR at ¶ 76.) Because this enhancement applies, it makes Mr. Buyanovsky ineligible for the two-level reduction as a zero-point offender under U.S.S.G. § 4C1.1.

1. **Role in the Offense Enhancement**

"The government bears the burden of proving the facts necessary to support the enhancement by a preponderance of the evidence. *United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir. 1995). We review the district court's finding for clear error. [*United States v.*] *Tagore*, 158 F.3d [1124] at 1130 [10th Cir. 1998]." *United States v. Egbert*, 562 F. 3d 1092, 1103 (10th Cir. 2009).

U.S.S.G. § 3B1.1(c) authorizes the Court to increase a defendant's offense level by 2 levels if the defendant was "an organizer, leader, manager, or

supervisor in any criminal activity."

"To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, comment. (n.2).

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4).

There is no dispute that there were multiple "participants" in this conspiracy, but the issue is whether Mr. Buyanovsky was an "organizer, leader, manager, or supervisor" over at least one of the other participants.

> Section 3B1.1 of the sentencing guidelines permits a district court to assess up to a four level enhancement based on a defendant's role in the offense. The sentencing guidelines provide that a defendant's total offense level should be increased by three levels if he or she "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive . . ." U.S.S.G. § 3B1.1(b). An enhancement under this section requires the involvement of at least one "participant" other than the defendant, and a "participant" is defined as a "person who is criminally responsible for the commission of the offense." *United States v. Gallant*, 537 F.3d 1202, 1241 (10th Cir. 2008). The defendant must also exercise some degree of "decision-making authority or control over a subordinate." *United States v. Pena-Hermosillo*, 522 F.3d 1108, 1112

> (10th Cir. 2008); see also *United States v. Gonzalez Edeza*, 359 F.3d 1246, 1248 (10th Cir. 2004) ("At bottom, '[a] supervisor is one who exercised some degree of control over others involved in the commission of the offense or … [who was] responsible for organizing others for the purpose of carrying out the crime.'") (quoting *United States v. Allemand*, 34 F.3d 923, 931 (10th Cir. 1994)).

*United States v. Beltran*, 571 F.3d 1013, 1020-21 (10th Cir. 2009).

While Mr. Buyanovsky and Mr. Robertson conducted aspects of the KanRus business as partners, Mr. Buyanovsky controlled the financial accounts, which meant he exercised "some degree of control over" Mr. Robertson. Granted, Mr. Buyanovsky permitted Mr. Robertson to store airplanes in the hangar rent-free and took steps toward other compensation for Mr. Robertson, but that does not require them to be "equals" in the criminal business. Rather, Mr. Buyanovsky exercised his control over Mr. Robertson by offering incentives so Mr. Robertson would continue to assist Mr. Buyanovsky in their jointly undertaken criminal activity. Mr. Robertson could not proceed with the transactions absent Mr. Buyanovsky approving shipments once funds arrived in the accounts controlled by Mr. Buyanovsky.

Thus, Mr. Buyanovsky exercised control over Mr. Robertson as the owner of KanRus, as the one directing the timing of shipments once funds arrived in the accounts Mr. Buyanovsky controlled, and as the one who assented to the

scheme to circumvent the enhanced export regulations after Russia invaded Ukraine.

The Court should overrule Mr. Buyanovsky's objection to the PSR.

### 2. Zero-Point Offender Reduction

Because the two-level role in the offense enhancement applies, Mr. Buyanovsky is ineligible for this two-level reduction.

The Court should overrule Mr. Buyanovsky's objection to the PSR.

### B. *Sentence of 24 Months is Consistent with Relevant 3553(a) Factors*

Title 18, U.S.C. § 3553(a) provides, in part, the following.

> (a) Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;
>
> (4) the kinds of sentences and the sentencing established for
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines
> . . .
>
> (5) any pertinent policy statement
> . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

*Id*.

The Government will not individually address each § 3553(a) factor. Most of the factors are implicitly taken into consideration by the applicable sentencing guideline provision in this case. There are several particularly relevant factors that, when analyzed by this Court, demonstrate that a 24-month term of imprisonment is the sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2).

1. **The nature and circumstances of the offense.**

A defendant's guideline range takes into account several factors, including the facts of the case, the defendant's criminal history, and other relevant considerations. Here, appropriate weight is given to these factors when Mr.

Buyanovsky's guideline range was calculated.

The national security nature of these violations is identified with the heightened base offense level of 26 under U.S.S.G. § 2M5.1(a)(1). *See* PSR at ¶ 73. As opposed to presuming that offense level "overstates" the seriousness of the conviction, it demonstrates the "nature and circumstances" are serious and merit serious punishment. Mr. Buyanovsky established a company whose role developed into a scheme to wholly circumvent the export regulatory structure of the United States government and a scheme that provided avionics equipment to a country that invaded its neighboring country. United States export controls attempt to curtail the bloodshed by cutting off equipment that facilitates a war or enables the underlying economy that funds the war. Mr. Buyanovsky's criminal acts directly undermined that effort and threatened U.S. national security.

This is not a case of mere compliance failures. Mr. Buyanovsky knew he was violating export controls and took steps intended to achieve that end. He submitted false EEI filings, received payments from front companies, and deliberately sent exports to third countries to then reship to Russia. He and Mr. Robertson advised their customers how to evade export controls themselves. Mr. Buyanovsky was fully aware that his conduct was deceptive and served to

undermine U.S. interests, but simply did not care.

Nor was this a one-time lapse in judgment. Mr. Buyanovsky facilitated illegal exports repeatedly, even before Russia's invasion of Ukraine. He had every opportunity to conform his conduct to the law, but chose not to do so. Indeed, Mr. Buyanovsky only stopped committing these crimes because he was arrested.

**2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment of the offense, to afford adequate deterrence, and to protect the public.**

The mere fact that the base offense level is 26 demonstrates its seriousness. The fact that Mr. Buyanovsky violated the export laws and regulations of the United States before the invasion of Ukraine demonstrates a lack of respect for the law, particularly because he readily participated in submitting false information to better himself. The fact that Latvians considered this conspiracy as akin to participating in or promoting "war crimes" speaks to weightiness of his acts to those closest to Russia.

There is a need for deterrence in this case. The materials submitted with Mr. Buyanovsky's sentencing memorandum appear to reveal someone who realized his criminal activity needed to cease. The three years since his arrest may suggest specific deterrence is not a critical factor. Yet, a sentence of

imprisonment is appropriate to convey the perceived incentives of Mr. Buyanovsky's crime are outweighed by the significant consequences for those who are caught. *Cf. United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (noting that white-collar crime requires punishment to ensure that the crime's risks, discounted by the possibility of not getting caught, do not leave it as "a game worth playing") (citation omitted); *see also United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("[W]hite-collar criminals 'act rationally, calculating and comparing the risks and rewards before deciding whether to engage in criminal activity.'") (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)).

There is also a need for general deterrence. Individuals like Mr. Buyanovsky embedded in the international avionics equipment distribution network provide the means that, when abused, creates a means for adversary nations to advance malicious ends. Without corrupt salesmen, smuggling schemes like Mr. Buyanovsky's would be less likely to succeed. A significant sentence will send a powerful message to others that facilitating and making illegal exports to Russia will result in imprisonment and other consequences. Indeed, even distributors who do not intentionally violate the law are more likely to engage in rigorous compliance activity if they know that the failure to do so

may result in serious consequences.

The purpose of our export control laws is to protect our national security interests. But these laws are only as effective as their enforcement allows them to be. Absent rigorous enforcement, they cannot produce their intended result. Enforcement means not only bringing criminal prosecutions, but imposing substantial punishment on those who put our nation at risk by violating regulations meant to keep us safe.

A 24-month sentence is necessary to promote respect for the law, provide just punishment, to afford adequate deterrence, and to protect the public.

### 3. The Need to Avoid Unwarranted Sentencing Disparities.

The 24-month sentence recommended by the United States avoids any unwarranted sentencing disparity for Mr. Buyanovsky. The best comparators are looking at those defendants within similar categories. Mr. Buyanovsky's memo attempts to highlight similarities and differences within this case and other cases throughout the country. However, there is much unknown about cases outside this one.

Granting the variance recommended by the United States avoids unwarranted disparities with a fulsome comparison of known similarities and differences to defendants sentenced in this District.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully moves this Court to impose a sentence of 24 months' imprisonment, followed by a term of supervised release, the mandatory special assessment of $100, and the imposition of a forfeiture judgment.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
United States Attorney
District of Kansas

By: s/Ryan J. Huschka
Ryan J. Huschka
Criminal Chief
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730
(913) 551-6541 (fax)
Ryan.Huschka@usdoj.gov
Kan. S. Ct. No. 23840

s/Scott C. Rask
Scott C. Rask
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730
(913) 551-6541 (fax)
Scott.Rask@usdoj.gov

Kan. S. Ct. No. 15643

**CERTIFICATE OF SERVICE**

I certify that on September 22, 2026, I electronically filed this Sentencing Memorandum with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to those attorneys who have entered their appearance in the case.

By: s/Scott C. Rask
Scott C. Rask, #15643
Assistant United States Attorney